## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Melvin Schwarzkopf,

Plaintiff,

Civ. No. 10-2774 (RHK/JJK)
**MEMORANDUM OPINION
AND ORDER**

v.

Brunswick Corporation d/b/a Life Fitness,

Defendant.

---

Susan M. Coler, Joni M. Thome, Frances E. Baillon, Matthew S. Nolan, Halunen & Associates, Minneapolis, Minnesota, for Plaintiff.

Andrew J. Voss, Sarah J. Gorajski, Littler Mendelson, P.C., Minneapolis, Minnesota, for Defendant.

---

### INTRODUCTION

Plaintiff Melvin Schwarzkopf previously worked for Defendant Brunswick Corporation d/b/a Life Fitness ("Brunswick").   He commenced this action in June 2010, alleging that Brunswick discriminated against him on account of his mental disabilities in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.01 *et seq.*   He also alleges that Brunswick retaliated against him after he complained about the alleged discrimination.   Brunswick now moves for summary judgment.   For the reasons set forth below, the Court will grant its Motion in part and deny it in part.

# BACKGROUND[1]

Suffice it to say, the parties paint a very different picture of the events culminating in this lawsuit.   Generally speaking, Brunswick denies the occurrence of much (if not most) of the conduct Schwarzkopf cites to support his claims.   At this stage of the proceedings, the Court is obligated to view the record in the light most favorable to Schwarzkopf, and it has done so below.   See Graves v. Ark. Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000).   However, while the Court has determined that part of this case will survive to trial, it expresses no opinion on Schwarzkopf's likelihood of success at trial or his ability to survive a motion for judgment as a matter of law after the presentation of his case.

Brunswick manufactures fitness equipment.   It hired Schwarzkopf in 2001 as a fabricator in its Ramsey, Minnesota, manufacturing facility.   (Gorajski Aff. Ex. B-2, at Ex. 1.)

Schwarzkopf has struggled with depression and general anxiety disorder for most of his life.   (Schwarzkopf Dep. at 49-50.)   In fact, in the early 1990s, he voluntarily

---

[1] The Court notes that the background facts recited in Schwarzkopf's brief often cite lengthy documents without indicating where in those documents the cited material can be found.   For example, Schwarzkopf repeatedly cites Exhibit 33 to the Declaration of Joni Thome, which comprises approximately 70 pages of single-spaced, handwritten notes from a diary Schwarzkopf maintained in 2006 and 2007.   His citations, however, do not indicate the page on which the relevant matter is located.   This will not suffice.   See, e.g., Gilbert v. Des Moines Area Cmty. Coll., 495 F.3d 906, 915 (8th Cir. 2007) ("A district court is not required to speculate on which portion of the record [a] party relies, nor is it obligated to wade through and search the entire record for some specific fact that might support th[at] party's claim.") (citation omitted); Howard v. Columbia Pub. Sch. Dist., 363 F.3d 797, 800 (8th Cir. 2004) ("Simply providing a massive record does not satisfy th[e] [non-moving party's] burden, and we will not sort through a voluminous record in an effort to find support for the plaintiff's allegations.").   Nevertheless, the Court has endeavored to locate the cited material in his lengthy submissions.

committed himself to a mental hospital for treatment.   (Id. at 19.)   The anxiety has caused him sleeping problems which, in turn, make it difficult for him to focus and concentrate. (Id. at 51.)   Around the time he applied for employment with Brunswick, his symptoms were in "remission."   (Id. at 50.)   He did not inform Brunswick of his conditions at that time.   (Gorajski Aff. Ex. B-2, at Ex 1.)

In his first few years of employment, Schwarzkopf had no difficulty performing his job duties and got along well with his co-workers.   (Schwarzkopf Dep. at 60-62.)   In 2002 he was promoted to "Mechanic I," a primarily janitorial job, including changing light bulbs, collecting garbage, and the like.   (Id. at 63-64; Gorajski Aff. Ex. B-2, at Ex. 21.) He also performed some "Mechanic II" duties, which involved preventative maintenance, fixing and installing machines, and supervising temporary workers.   (Schwarzkopf Dep. at 69-70.)   As a Mechanic I, he worked for several years with Mark Hager and Duane Bauer, both of whom held Mechanic III positions.   (Bauer Dep. at 22; Hager Dep. at 12-14.)   According to Schwarzkopf, he made Hager and Bauer aware of his mental illnesses – "anxiety disorder" and "attention deficit" disorder – in 2004 and 2005, respectively.   (Schwarzkopf Dep. at 98-99.)[2]

Prior to June 2005, Schwarzkopf had no problems working with either Hager or Bauer.   (Id. at 78-80.)   In fact, Hager helped him get an "extra" raise in 2004, and when Hager was promoted to supervisor in June 2005, he promoted Schwarzkopf to Mechanic II. (Id. at 78-82; Hager Dep. at 14; Gorajski Aff. Ex. B-2, at Ex 26.)   Schwarzkopf was able to

---

[2] Schwarzkopf repeatedly claims that he has attention-deficit disorder that causes him "cognitive problems" (see, e.g., Mem. in Opp'n at 3), but there is little medical support for that claim in the record.

perform the requirements of this new position (Schwarzkopf Dep. at 83), and he received a favorable performance review later that year (Gorajski Aff. Ex. B-2, at Ex. 29).

However, in late 2005 or early 2006, Bauer began calling Schwarzkopf names like "stupid," "idiot," "mental case," "dumb," and "incompetent" on a nearly daily basis. (Schwarzkopf Dep. at 102-11, 119-20, 125.)   He and another mechanic, Mike Luedtke, told Schwarzkopf they worried he "might go postal."   (Id. at 108.)   Luedtke also frequently made derogatory comments, like calling Schwarzkopf a "mental case."   (Id. at 133-36, 141-42.)   In another instance in February 2006, Bauer told Schwarzkopf that people who have been on Social Security disability, as Bauer was aware Schwarzkopf once had been, "are worthless pieces of shit."   (Id. at 161.)   And on several occasions Bauer told Schwarzkopf that "we should put a shock collar on you" because Schwarzkopf was "so forgetful."   (Id. at 120-23.)   Bauer continued to treat him in a demeaning manner for the remainder of his employment, frequently calling him humiliating and degrading names and yelling at him in front of other employees.   (Id. at 115, 120-21, 128-29.)

Schwarzkopf complained to Hager, but he took no action.   (Id. at 106; see also Hager Dep. at 47-48.)   In fact, Schwarzkopf claims that in early 2006, Bauer convinced Hager to start harassing him in the same fashion as Bauer and Luedtke had been. (Schwarzkopf Dep. at 126, 133, 147-48.)   Hager, for example, laughed at Bauer's "shock collar" comment.   (Id. at 123.)   He yelled at Schwarzkopf and called him an "idiot," "dumb," and "stupid."   (Id. at 145-48, 151.)   He got angry when Schwarzkopf asked for additional directions to complete projects, even after Schwarzkopf told him that he had "too much anxiety" and "thought [he] had attention deficit [disorder]."   (Id. at 145-46.)

- 4 -

In one instance Hager felt Schwarzkopf was taking too long to complete a project and asked, "What are you?   An idiot?"   When Schwarzkopf tried to explain the delay, Hager "charged [at him] with . . . a fist," as if Hager were going to strike him.   (Id. at 147-48.) And according to Schwarzkopf, Hager typically did not support him in the same way as, and scrutinized his work more carefully than, other maintenance department employees, frequently making him perform menial and degrading tasks like sending him to McDonald's to pick up food for the department and making him clean up spills, broadcasting to the entire department, "Mel, get the mop!"   (Id. at 122, 125-27, 163-66.)

Sometime in 2006, the symptoms associated with Schwarzkopf's depression and anxiety disorder returned, causing him to lose sleep, lack focus, and struggle to concentrate.   (Id. at 50-51.)[3]   Hager noticed a decline in his performance, observing that he had difficulty maintaining concentration and following directions.   (Hager Dep. at 15, 23, 28.)

On September 7, 2006, Schwarzkopf was injured on the job.   (Schwarzkopf Dep. at 150.)   The following day, he was called to a meeting with Hager and Cathy Mensing, Brunswick's Human Resources Manager.   (Id. at 151; Hager Dep. at 27-28.)   He thought the meeting had been called to discuss his injury and work restrictions, but rather it was to discuss his "poor" performance.   (Schwarzkopf Dep. at 152; Hager Dep. at 28.) Schwarzkopf stated that he did not understand the complaints and if his performance had been poor, it was due to Hager constantly shouting at him.   (Schwarzkopf Dep. at 152.)

---

[3] Earlier that year, Schwarzkopf's wife was involved in a car accident in which the other driver died, but he denied that it (or the subsequent legal proceedings against his wife) caused him any additional stress.   (Schwarzkopf Dep. at 94-95.)

He explained that he could not grasp matters when others yelled at him and he told Hager and Mensing about having been on Social Security disability in the past.   (Id. at 153-54; Gorajski Aff. Ex. B-2, at Ex. 34; Mensing Dep. at 101-02.)   He asked for blueprints to explain "big jobs," as his prior supervisor had given him, and that Hager "not yell" at him. (Schwarzkopf Dep. at 155-56.)   He also asked to be transferred to another position.   (Id. at 155.)   Mensing explained that the other positions he sought typically were given to temporary workers, but she would get back to him on his request.   (Id.)   She also suggested that he see a psychologist to help work through his anxiety problems.   (Id. at 153; Hager Dep. at 33-34.)

Later that day or the following day, Schwarzkopf met with Mensing alone and complained that Hager and Bauer were discriminating against him by yelling at him. (Mensing Dep. at 102-03.)   Mensing told him that there was no discrimination occurring, but that Hager "didn't have very good management skills."   (Id. at 103.)   Mensing thought that Schwarzkopf was simply unhappy and she did not perceive the complaints to be related to his mental disabilities.   (Id. at 106-10.)   However, she later spoke with Hager and asked whether he or any other maintenance employees had been harassing Schwarzkopf.   (Hager Dep. at 35-37.)   Hager denied any harassment.   (Id.)

In February 2007, Schwarzkopf again complained to Hager that Bauer had called him "nuts, crazy, mental case, paranoid, and postal."   (Schwarzkopf Dep. at 132.)   Hager told him that the reason people called him "postal is because you act so crazy."   (Id. at 133.)   When Schwarzkopf asked Hager to put a stop to the comments, Hager paged all maintenance workers to his office for a meeting and told them "if anybody has anything

they want to say about somebody, say it, have it out."   (Id. at 132-35; Hager Dep. at

40-41.)   At first no one spoke, but then Schwarzkopf, shaking and on the verge of crying,

complained that being called postal "was the worst thing anybody could ever say about

another worker.   It was unimaginable and so hurtful."  (Schwarzkopf Dep. at 133; see

also Hager Dep. at 41.)   He told his co-workers that he had some "mental problems" and

could "take some jokes and teasing," but not being called postal or being referred to as

"crazy."   (Schwarzkopf Dep. at 133; Hager Dep. at 42-43; Bauer Dep. at 16.)   Hager then

responded, "[d]on't be so paranoid.   They're not talking about you."   (Schwarzkopf Dep.

at 133.)

On February 14, 2007, Schwarzkopf e-mailed Mensing and Hager.   (Gorajski Aff.

Ex. B-2, at Ex. 34.)   He reminded them about their meeting the prior September at which

he had mentioned his "permanent mental disability," and he informed them that he had

sought counseling "as we discussed."   (Id.)   He also informed them that "as a result of all

the stress" from "work-related issues," he was taking medications that might impair his

ability to drive, so he felt he should not operate certain machinery.   (Id.)   Finally, he told

them that it "might be better off to replace me on the safety committee with someone else,"

because his "ability to remember [] is at an all time low and I cannot promise to remember

when the meetings are."   (Id.)[4]   Mensing responded that he should not operate any

equipment he felt he could not handle safely and she would "do a little research about

perm[anent] disabilities to be sure we address this properly for you."   (Id.)   She also

reminded him that the safety committee was "voluntary[,] so if you do not want to remain a

---

[4] It is unclear precisely what the "safety committee" is.

member of the committee, that is up to you."   (Id.)

By e-mail the following day, Schwarzkopf expressed his desire to continue working while receiving medical treatment, since testing showed his memory was "getting back to normal."   (Gorajski Aff. Ex. B-2, at Ex. 33.)   Mensing replied that she was "glad you feel you can continue to work and I'm VERY happy to hear you think you are getting better."   (Id.)   She also reminded him of the availability of leave under the Family and Medical Leave Act ("FMLA") for his medical appointments.   A short time later, Mensing and Hager suggested that Schwarzkopf did not have to continue working since he likely would qualify for disability, but he rejected their suggestion.   (Schwarzkopf Dep. at 195-96.)

In late February 2007, Schwarzkopf's physician referred him to an occupational medicine clinic for a work ability assessment, due to back problems.   (Gorajski Aff. Ex. B-2, at Ex. 38.)   In the meantime, his doctor recommended that he avoid long rides and any "strenuous work" that might put "pressure on [his] spine."   (Id.)   Schwarzkopf claims that he was later restricted from heavy lifting, but the clinic's "report of workability" indicated no lifting restrictions.   (Gorajski Aff. Ex. B-2, at Ex. 39.)   Nevertheless, he asserts that he informed Hager he could not perform heavy lifting, but Hager (and Bauer) tasked him with lifting a number of heavy computers and monitors anyway. (Schwarzkopf Dep. at 202-03; Thome Decl. Ex. 33 at MS000017.)[5]

Around this time, Hager was promoted and Bauer replaced him as Schwarzkopf's direct supervisor.   Bauer's demeaning attitude and comments worsened after the

_____

[5]  As discussed in more detail below (see infra at 14-16), Exhibit 33 is Schwarzkopf's handwritten diary of events in 2006 and 2007.   It is attached to the Declaration of his counsel, Joni M. Thome, Esq.

promotion.   (Thome Decl. Ex. 33 at MS000021.)   He called Schwarzkopf a "nut," "dumb," and "stupid," and another maintenance employee reported that Bauer had called him (Schwarzkopf) "as worthless as tits on a boar pig."   (Id. at MS000021-32.)   Bauer "ordered" Schwarzkopf to work overtime that was not required of other employees and threatened to reprimand him if he failed to do so.   (Id. at MS000032-34.)

On March 29, 2007, Hager conducted Schwarzkopf's annual review for 2006. (Gorajski Aff. Ex. B-2, at Ex. 32.)   The review was generally positive, although it noted that Schwarzkopf's performance had slipped in 2006.   (Id.)   In the section for employee comments, Schwarzkopf noted that while 2006 "may [have] seem[ed] like a bad year," it actually was not "considering the fact that I was a disabled person prior to being hired." (Id.)   He vowed to do better "if people talk in a normal tone of voice vs. loud, and [stop] scolding" him.   (Id.)

Although the exact date is unclear, sometime in March 2007 Schwarzkopf requested intermittent FMLA leave due to depression, carpal-tunnel syndrome, and a back injury. (Schwarzkopf Dep. at 201-02; Gorajski Aff. Ex. B-2, at Exs. 36-37.)   In early April, he submitted to Brunswick three FMLA certification forms filled out by his doctors. (Gorajski Aff. Ex. B-2, at Exs. 40-42.)   The forms noted that he suffered from depression, closed-head trauma due to a car accident, dizziness, and a cervical sprain.   (Id.)   His request was approved, and he ultimately took a leave of absence commencing on April 11, 2007.   (Id. Ex. 43; Thome Decl. Ex. 9.)   It was expected that the leave would last "for about 12 weeks."   (Thome Decl. Ex. 9; Schwarzkopf Dep. at 212.)   Schwarzkopf's role on the safety committee was reassigned to Jesse Barke, another maintenance department

employee, during his absence.   (Schwarzkopf Dep. at 225-27; Hager Dep. at 75-76.)

On May 17, 2007, while on leave, Schwarzkopf filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), asserting that Bauer and Hager had harassed him on account of his mental disabilities and retaliated against him due to his complaints.   (Gorajski Aff Ex. B-2, at Ex. 13.)   Mensing received and reviewed the charge and was "very surprised" that Schwarzkopf was alleging disability discrimination. (Mensing Dep. at 134-35.)   She spoke to Hager and others to "put the pieces together" about Schwarzkopf's complaints, because she had not previously understood him to be alleging harassment or discrimination based on mental illness.   (Id. at 136-37, 143-45.) Ultimately, she was unable to substantiate his complaints.   (Id. at 176.)

Schwarzkopf returned from leave on July 2, 2007, at which time Hager informed him that Bauer had voluntarily resigned from his supervisor position.   (Schwarzkopf Dep. at 218-20; Mensing Dep. at 152; Bauer Dep. at 56.)   Hager also informed him that Barke would continue performing the safety-committee duties and another maintenance worker would handle his former responsibilities with regard to hazardous waste.   (Schwarzkopf Dep. at 44, 220-23, 266.)   Schwarzkopf was unhappy with these changes and e-mailed Hager and others to complain.   (Gorajski Aff. Ex. B-2, at Exs. 47, 51; Thome Decl. Ex. 14; Schwarzkopf Dep. at 226-30.)   Several maintenance workers then complained to Hager that Schwarzkopf's repeated protestations were disruptive and distracting them from their work.   (Hager Dep. at 77-79; Mensing Dep. at 168-74.)   Hager yelled at Schwarzkopf about the complaints and on July 12, 2007, told him that his job duties had been taken away because of his poor performance.   (Thome Decl. Ex. 33 at

- 10 -

MS000057-58.)   The following day, Mensing left a message at Schwarzkopf's home telling him that he was suspended with pay for "badmouthing Hager" and that he could return to work after mediation of the EEOC charge on July 19, 2007.   (Schwarzkopf Dep. at 234, 248; Mensing Dep. at 167-68, 178-79, 182-83; Thome Decl. Ex. 33 at MS000060.) That mediation failed.

Upon returning to work on July 24, 2007, Schwarzkopf complained to Mensing that he had found two "jokes" about persons with disabilities in his work area two weeks earlier (before his suspension), one in his desk drawer and another on Bauer's desk. (Schwarzkopf Dep. at 236-43; Gorajski Aff. Ex. B-2, at Ex. 48; Thome Decl. Ex. 19.)   He also met with Mensing and a human-resources assistant, Blair Horner, and complained that Hager was retaliating against him.   Mensing was unable to substantiate these complaints. (Mensing Dep. at 189-90.)   Nevertheless, she conducted diversity training with the maintenance department that week, including having employees watch a video entitled, "From Sex to Religion."   (Id. at 190-91.)   Disability discrimination was not "discussed at length" as part of this training, and Schwarzkopf was required to watch the video separately from the rest of the maintenance department.   (Id. at 191; Thome Decl. Ex. 20.)

On August 2, 2007, Schwarzkopf filed a complaint with the Occupational Safety and Health Administration regarding certain safety issues he perceived at Brunswick. (Schwarzkopf Dep. at 312; Gorajski Aff. Ex. B-2, at Ex. 55.)   He left for vacation a few days later.   (Schwarzkopf Dep. at 310.)   When he returned, Hager chided him and told him to direct all future safety complaints to him.   (Gorajski Aff. Ex. B-2, at Ex. 57.)

On August 15, 2007, Schwarzkopf submitted a doctor's note to Mensing and Hager,

which stated that he had "a mental disability in the form of anxiety and depression" and that, because he had difficulty with instructions, "[i]t would be to [his] advantage to have instructions given slowly or written out."   (Thome Aff. Ex. 18.)   When Hager read the notes, he crumpled them up and threw them aside, informing Schwarzkopf that he would not give him an accommodation until told to do so by Mensing.   (Schwarzkopf Dep. at 326-27.)

On Friday, August 17, 2007, Schwarzkopf was completing the installation of an emergency eyewash station when Hager approached and asked him when he would complete a previously assigned job moving lockers.   (Id. at 337-41; Thome Decl. Ex. 33 at MS000069.)   An argument ensued, with Hager calling Schwarzkopf "stupid," "dummy," and "incompetent."   (Schwarzkopf Dep. at 337-43.)   Hager told Schwarzkopf that he was yelling and being insubordinate.   (Id.)   Schwarzkopf threatened to quit if Hager told Mensing that he was yelling, as he claims he was not.   (Id, at 344.)

Ultimately, Hager and Schwarzkopf made their way to Horner's office, since Mensing was out of town.   Along the way, Hager made a "neck slash" gesture to Schwarzkopf.   (Id. at 346-47.)   In Horner's office, Schwarzkopf complained that Hager repeatedly harassed and discriminated against him, and Hager responded by calling him "dumb" and yelling that he (Schwarzkopf) had tried to make him look bad.   Ultimately, Hager told Schwarzkopf to go home for the day.   (Id. at 350-55.)   Schwarzkopf put his keys and credit card on Horner's desk and said, "it's just like I'm getting fired."   (Id. at 357-58.)   Hager smiled and nodded.   (Id.)   He told another Brunswick manager, "Mel's quitting!"   (Id. at 361; Thome Decl. Ex. 33 at MS000070.)

Schwarzkopf called and left messages for Mensing later that day and over the weekend.   (Schwarzkopf Dep. at 363-65.)   He was very upset and stated that he had not quit.   (Id. at 362, 371; Thome Decl. Ex. 33 at MS000070.)   Mensing returned to work on Monday, August 21, 2007; she called Schwarzkopf on Tuesday and Wednesday of that week but she did not reach him.   (Mensing Dep. at 200, 204-05.)[6]

Brunswick considered Schwarzkopf suspended with pay for the week of August 20, 2007.   (Id. at 205-08 & Ex. 6.)   Schwarzkopf claims that he believed his employment had been terminated, although his own diary indicates that both Hager and Horner told him he was merely suspended.   (Schwarzkopf Dep. at 362; Thome Decl. Ex. 33 at MS000070.) Ultimately, he did not return to work at Brunswick, and on August 29, 2007, the company deemed him to have voluntarily resigned his job for failing to report to work on Monday, August 27, and Tuesday, August 28.   He then amended his EEOC charge to add a claim for constructive discharge.   (Gorajski Aff. Ex. B-2, at Ex. 14.)

On February 19, 2010, the EEOC issued a Determination finding "reasonable cause" to believe that Brunswick had retaliated against Schwarzkopf "in that he was subjected to disciplinary action in violation of the ADA," although it offered no explanation what that retaliation was.   (Thome Decl. Ex. 12.)   Nor did it make any findings with respect to Schwarzkopf's claims of harassment.   On June 30, 2010, Schwarzkopf commenced the instant action, asserting discrimination and retaliation claims against Brunswick under the ADA and the MHRA.   With discovery complete, Brunswick

---

[6] Schwarzkopf asserts that he received no messages from Mensing, but he has proffered no evidence contradicting her assertion that she *called* him twice during the week of August 21, 2007.

now moves for summary judgment.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).   The moving party bears the burden of showing that the material facts in the case are undisputed.   Id. at 322; Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009).   The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Carraher v. Target Corp., 503 F.3d 714, 716 (8th Cir. 2007).   The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wingate v. Gage Cnty. Sch. Dist., No. 34, 528 F.3d 1074, 1078-79 (8th Cir. 2008).[7]

## ANALYSIS

**I.**   **The evidentiary objection**

Before addressing the merits of Brunswick's Motion, the Court must consider an evidentiary objection.   Specifically, Brunswick objects to the Court's consideration of

---

[7] As the Eighth Circuit noted just last week, summary judgment is equally appropriate in a discrimination case as in any other case in which there exists no genuine issue of material fact. Torgerson v. City of Rochester, __ F.3d __, 2011 WL 2135636, at *8 (8th Cir. 2011) (*en banc*) ("There is no 'discrimination case exception' to the application of summary judgment.").

Exhibit 33 to the Declaration of Schwarzkopf's counsel, Joni M. Thome, Esq.   Its

objection lacks merit.[8]

Exhibit 33 is a handwritten diary Schwarzkopf maintained in 2006 and 2007.

Brunswick argues that the diary is hearsay (Reply Mem. at 2-3), and it is generally true that

the Court may not consider hearsay evidence at summary judgment.   E.g., Mays v.

Rhodes, 255 F.3d 644, 648 (8th Cir. 2001).   But Brunswick has waived this objection *by*

*itself submitting the very same diary in connection with its Motion* – it is attached to the

Affidavit of Sarah J. Gorajski, Esq., one of Brunswick's lawyers.   (See Gorajski Aff. Ex.

B-2, at Ex. 49.)   It has also cited the diary in its Motion papers.   (See Reply at 9.)   As

succinctly stated by the Fifth Circuit, "[i]t is settled law that one waives his right to object

to the admission of evidence if he later introduces . . . that very evidence himself."   United

States v. Truitt, 440 F.2d 1070, 1071 (5th Cir. 1971) (*per curiam*); accord, e.g., Mercer v.

Theriot, 377 U.S. 152, 154 (1964) (*per curiam*) (finding no error in admitting hearsay

evidence when party elicited same evidence in his examination of the witness); United

States v. Perez, 960 F.2d 1569, 1573 (11th Cir. 1992) (*per curiam*).

When the Court pointed out this fact to Brunswick at oral argument, its counsel

responded that some parts of the diary are admissible because they constitute admissions

by Schwarzkopf, while other parts are hearsay.   But Brunswick did not submit only those

---

[8] Brunswick generically claims that *all* of the Exhibits attached to the Thome Declaration are
inadmissible because she lacks sufficient personal knowledge to authenticate them.   (Reply Mem.
at 2.)   However, there cannot be any serious dispute as to the authenticity of most of the Exhibits,
many of which Brunswick itself relies upon in support of its Motion, such as e-mails,
Schwarzkopf's EEOC charge, and the like.   Regardless, Brunswick specifically seeks the
exclusion only of Exhibit 33.   (It had initially sought the exclusion of *two* Exhibits – 11 and 33 –
but Schwarzkopf agreed to withdraw Exhibit 11 shortly before oral argument, thereby rendering
that objection moot.   (See Doc. No. 25.))

portions of the diary allegedly constituting admissions – it submitted the *entire diary*.

Under these circumstances, the Court finds any objection to Exhibit 33 has been waived.[9]

## II.     The merits

A review of the Complaint and Schwarzkopf's brief has left the Court somewhat

unclear as to the precise nature of certain of his claims.   It addresses each claim in turn

below, noting its concerns where a particular claim is amorphous or otherwise lacks

clarity.[10]

### A.     Hostile work environment

Schwarzkopf first argues that Brunswick subjected him to a hostile work

environment by directing "consistent, repeated hostile, humiliating and harassing

comments and conduct" at him "from late 2006 to his termination."   (Mem. in Opp'n at

28.)   To establish a hostile work environment in violation of the ADA, a plaintiff must

show that "he is a member of the class of people protected by the statute, that he was

subject to unwelcome harassment, that the harassment resulted from his membership in the

protected class, and that the harassment was severe enough to affect the terms, conditions,

or privileges of his employment."   Shaver v. Indep. Stave Co., 350 F.3d 716, 720 (8th Cir.

2003).   Here, Brunswick argues that Schwarzkopf's claim falters on the final prong,

contending that he has failed to proffer evidence of "harassment sufficiently severe or

---

[9] Moreover, the diary was produced in discovery and Brunswick's counsel had the opportunity to ask – and did ask – Schwarzkopf questions about it in his deposition.   Hence, Brunswick was well aware that Schwarzkopf intended to rely on the diary to support his claims.   Yet, it did not object to the Court's consideration thereof in its Motion; it first raised this argument in its Reply.   See D. Minn. LR 7.2(b)(3) (new arguments not permitted in reply briefs).

[10] The Court reviews Schwarzkopf's MHRA claims in the same fashion as his ADA claims.   See, e.g., Loye v. Cnty. of Dakota, 625 F.3d 494, 496 n.2 (8th Cir. 2010).

pervasive to affect a term or condition of employment." (Def. Mem. at 32.)

The difficulty in analyzing this argument stems from the hazy line between "illegal harassment and merely unpleasant conduct." Hathaway v. Runyon, 132 F.3d 1214, 1221 (8th Cir. 1997). Discussing the distinction between the two in a sexual-harassment case, Seventh Circuit Judge Richard A. Posner has stated:

> [Discrimination laws are] not designed to purge the workplace of vulgarity[, and hence] [d]rawing the line is not always easy. On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers. We [previously] spoke . . . of "the line that separates the merely vulgar and mildly offensive from the deeply offensive and sexually harassing." It is not a bright line, obviously, this line between a *merely unpleasant* working environment on the one hand and a *hostile or deeply repugnant* one on the other.

Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430-31 (7th Cir. 1995) (emphases added) (citations omitted). In attempting to determine whether challenged conduct crosses the line separating unpleasantness from harassment, courts must consider the "totality of the circumstances," including the frequency of the conduct, its "severity," whether it is "physically threatening or humiliating, or a mere offensive utterance," and whether it reasonably interferes with the employee's performance. Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). But these categories, too, leave much to be desired. For example, while some comments facially may be so tinged with discriminatory animus to easily appear "severe," determining whether others fall into that category is mere guesswork, left largely to the whim – and experience, temperament, and sensitivity – of the presiding judge. See id. at 24 (Scalia, J., concurring) (lamenting that the standard "does not seem to

me a very clear" one).

It is perhaps not surprising, then, that guidance from our own court of appeals is not a model of clarity as to whether a lengthy train of demeaning and derogatory comments by co-workers suffices to establish a hostile work environment.   For example, the plaintiff in Shaver suffered from nocturnal epilepsy and had a portion of his brain replaced with a metal plate in an attempt to alleviate seizures.   He proffered evidence that his co-workers, including some supervisors, "routinely" referred to him as "platehead" over a period of two years.   Others suggested that the plaintiff was stupid, and on one occasion a co-worker said the plaintiff "pissed in his pants when the microwave was on."   The Eighth Circuit held that these comments, "[t]aken as a whole," were insufficiently severe or pervasive to establish a hostile work environment.   350 F.3d at 721-22.   Similarly, in Arraleh v. County of Ramsey, 461 F.3d 967 (8th Cir. 2006), the Muslim plaintiff claimed he was "subjected to intense negative scrutiny and derogatory comments from his coworkers about his race, appearance, and national origin" from the beginning of his employment. Id. at 978 n.4.   Included were repeated negative comments about "you people," the suggestion that all Muslims should be killed, a comment that giving the plaintiff a job was "like raising little terrorist kids," and calling the plaintiff "Mr. Cocoa."   The Eighth Circuit affirmed the dismissal of the plaintiff's hostile-work-environment claim, concluding that the evidence did "not meet the rigorous standards reflected in circuit precedent to support" it.   Id. at 979; see also Canady v. Wal-Mart Stores, Inc., 440 F.3d 1031, 1034-36 (8th Cir. 2006) (repeated references by supervisor to plaintiff as "nigga" and "lawn jockey," and suggestions that his "skin color seemed to wipe off onto towels,"

insufficient to establish hostile work environment).

By contrast, the plaintiff in Ross v. Douglas County, Nebraska, 234 F.3d 391 (8th Cir. 2000), proffered evidence that his supervisor "constantly" referred to him as either "nigger" or "black boy."   Relying on Delph v. Dr. Pepper Bottling Co. of Paragould, Inc., 130 F.3d 349 (8th Cir. 1997), Ross concluded that the "stream of racial slurs" directed toward the plaintiff sufficed to show that he was subjected to a racially hostile workplace. 234 F.3d at 396-97.   Likewise, in Smith v. St. Louis University, the Eighth Circuit found the plaintiff's evidence that her supervisor "frequently and regularly made derogatory comments toward" her and another female was sufficient to create a jury question on the severe or pervasive issue.   109 F.3d 1261, 1264-65 (8th Cir. 1997); see also Green v. Franklin Nat'l Bank of Minneapolis, 459 F.3d 903, 911-12 (8th Cir. 2006) (eight instances of co-worker calling African-American plaintiff "monkey," "black monkey," and "chimpanzee," and telling her to wear dreadlocks and that he wanted to "eat [her] liver," sufficient to support hostile-work-environment claim).[11]

Deciding which side of the line upon which the evidence falls here presents a difficult question.   The Court recognizes that "[h]arassment standards are demanding" and that "[s]imple teasing" and "offhand comments" do not "amount to discriminatory

---

[11]  At oral argument, Brunswick's counsel suggested that the Eighth Circuit has distinguished between non-actionable and actionable conduct by focusing on whether it is physically assaultive – that is, only once conduct threatens an assault or actually results in one does it cross the line dividing the "merely unpleasant" from harassment.   The Eighth Circuit has not drawn such a bright line, however.   See, e.g., Green, 459 F.3d at 911 ("Unquestionably, a working environment dominated by racial slurs constitutes a violation of Title VII.") (citation omitted); Smith, 109 F.3d at 1264-65 (evidence that plaintiff's supervisor "frequently and regularly made derogatory comments toward" her and another female was sufficient, despite no physically threatening conduct).

changes in the terms and conditions of employment." <u>Arraleh</u>, 461 F.3d at 979.   Rather,

"[a]ctionable conduct must . . . be *extreme*," and "discriminatory intimidation, ridicule, and

insult [must] permeate[] the workplace." <u>Wilkie v. Dep't of Health & Human Servs.</u>, 638

F.3d 944, 953 (8th Cir. 2011) (emphasis added) (citation omitted).   After considering the

totality of the circumstances, however, the Court concludes that Schwarzkopf has

proffered sufficient evidence to create a genuine issue whether he was subjected to a

hostile work environment.

Taken in the light most favorable to him, the record discloses that his co-workers

repeatedly made derogatory comments about his mental illnesses over a period of more

than a year.   While some of the comments might tend toward "simple teasing" ("dumb,"

"dummy," "stupid") and do not facially relate to depression or anxiety problems, others

("go postal," "paranoid," "crazy," "mental case") are more significant.   Many (if not

most) of the comments were made by Hager and Bauer, Schwarzkopf's supervisors for at

least some of his employment.   <u>See</u> <u>Delph</u>, 130 F.3d at 356 (offensive comments by

supervisors are "all the more egregious"); <u>Smith</u>, 109 F.3d at 1264 (same).   They were

often made in the presence of others.   <u>Carter v. Chrysler Corp.</u>, 173 F.3d 693, 702 (8th Cir.

1999) (noting that one relevant consideration is "the presence or absence of other people"

when challenged comments were made).   Schwarzkopf's performance suffered in 2006

after symptoms of his mental illness reappeared, arguably in response to the derogatory

comments, and he sought medical treatment for his depression, lack of focus, and

concentration difficulties.   <u>See</u> <u>Smith</u>, 109 F.3d at 1264 (considering fact that plaintiff was

hospitalized and suffered depression during the time discriminatory comments were made,

even though defendant disputed whether depression resulted from the comments).   And, at least some of the challenged conduct arguably was physically threatening, including the "shock collar" comment and Hager raising a fist to him.   See Green, 459 F.3d at 912 (comment by co-worker that he wanted to "eat [the plaintiff's] liver" sufficiently physically threatening, even if not "obviously racially motivated").

While a jury might not be persuaded that Schwarzkopf was subjected to a hostile work environment, the Court concludes that he has proffered sufficient evidence to at least have it decide that question.   See Carter, 173 F.3d at 702 (finding that plaintiff made submissible case on hostile-work-environment claim where she produced evidence that, over a period of two years, she "regularly suffered verbal abuse interlaced with sexual and racial epithets" which "occurred in the presence of her co-workers" and which "caused [her] humiliation and intimidation").[12]

## B.    Disability discrimination

Besides a hostile work environment, Schwarzkopf alleges that Brunswick discriminated against him in three tangible ways:   (1) suspending him in July 2007; (2) suspending and/or terminating him in August 2007; and (3) constructively discharging

---

[12]  Brunswick argues that Schwarzkopf's claim founders because, while he asserts he was harassed "hundreds of times," in his deposition he could only identify a "very few specific examples of the alleged harassment."   (Def. Mem. at 32; Reply Mem. at 6.)   As the Eighth Circuit noted in Ross, however, that Schwarzkopf "has not specifically alleged each individual incident does not defeat his [hostile-work-environment] claim."   234 F.3d at 397; see also Ways v. City of Lincoln, 871 F.2d 750, 755 (8th Cir. 1989) (upholding finding of racially hostile work environment, despite plaintiff offering only a few specific incidents of racial slurs, because the incidents were "simply examples of [what plaintiff] has encountered during his career"; it was not necessary for plaintiff "to compile an exhaustive litany of every offensive . . . slur or incident that he had been subject to or witnessed").

him.   (Mem. in Opp'n at 44.)   The Court concludes that none of these allegedly

discriminatory acts suffices to support a disability-discrimination claim.

### 1.   General discrimination principles

The ADA prohibits an employer from discriminating "against a qualified individual

on the basis of disability in regard to job application procedures, the hiring, advancement,

or discharge of employees, employee compensation, job training, and other terms,

conditions, and privileges of employment."   42 U.S.C. § 12112(a).   To establish a prima

facie case of discrimination under the ADA, a plaintiff must show that he (1) has a

disability within the meaning of the statute, (2) is qualified to perform the essential

functions of the job, with or without reasonable accommodation, and (3) suffered an

adverse employment action due to a disability.   E.g., Chalfant v. Titan Distribution, Inc.,

475 F.3d 982, 988 (8th Cir. 2007) (internal quotations and citation omitted); Wenzel v.

Mo.-Am. Water Co., 404 F.3d 1038, 1040 (8th Cir. 2005).   With these principles in mind,

the Court considers each of the actions challenged by Schwarzkopf.[13]

---

[13] A different analysis applies when a plaintiff proffers "direct evidence" of discrimination.   E.g.,
Norman v. Union Pac. R.R. Co., 606 F.3d 455, 459 (8th Cir. 2010).   Schwarzkopf claims that he
has adduced such evidence here, pointing to Hager's repeated derogatory comments.   (Mem. in
Opp'n at 42.)   But direct evidence is "evidence showing a specific link between the alleged
discriminatory animus and the challenged [action], sufficient to support a finding by a reasonable
fact finder that an illegitimate criterion actually motivated the" employer's conduct.   Griffith v.
City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004).   "Not all comments that may reflect a
discriminatory attitude are sufficiently related to the adverse employment action in question to
support such an inference."   Walton v. McDonnell Douglas Corp., 167 F.3d 423, 426 (8th Cir.
1999).   In particular, "statements by decisionmakers unrelated to the decisional process itself will
not suffice."   Id.   The plaintiff must instead proffer evidence "that *clearly points* to the presence
of an illegal motive" behind the employer's conduct.   King v. Hardesty, 517 F.3d 1049, 1057 (8th
Cir. 2008) (emphasis added).   Here, Schwarzkopf has not shown – or even attempted to show –
that Hager's comments were part of the decisional process vis-à-vis any of Brunswick's
challenged conduct.   It is simply not enough to point out that he made discriminatory comments

### 2.   The July 2007 suspension

Schwarzkopf first argues that Brunswick engaged in disability discrimination by suspending him immediately prior to the EEOC mediation in July 2007.   (Mem. in Opp'n at 44-45.)   As noted above, he must show that this suspension was an "adverse employment action" in order to succeed on this claim.   He cannot do so.

An adverse employment action is a "material employment disadvantage, such as a change in salary, benefits, or responsibilities."   Singletary v. Mo. Dep't of Corr., 423 F.3d 886, 891 (8th Cir. 2005); accord, e.g., Higgins v. Gonzalez, 481 F.3d 578, 584 (8th Cir. 2007).   Suspensions without pay generally do not satisfy this standard unless they involve additional collateral consequences.   See, e.g., Singletary, 423 F.3d at 891-92; Moisant v. Air Midwest, Inc., 291 F.3d 1028, 1032-33 (8th Cir. 2002).   Here, there is no suggestion that Schwarzkopf's pay, benefits, or responsibilities changed in any way as a result of his suspension in July 2007; indeed, he was returned to precisely the same job he previously held when the suspension ended.   Under these facts, it cannot have been an adverse employment action.   See Dickerson v. SecTek, Inc., 238 F. Supp. 2d 66, 80 (D.D.C. 2002) ("The Court can . . . find no compelling reason to conclude that short suspensions that leave no lasting effect on either the employee's present or future position or her pocketbook are adverse employment actions.").

---

in the past.   Walton, 167 F.3d at 426; Hossaini v. W. Mo. Med. Ctr., 97 F.3d 1085, 1088 (8th Cir. 1996) (analyzing national-origin-discrimination claims under McDonnell Douglas despite evidence that plaintiff's manager yelled at her "why [is] everything so different with you damn foreigners" and criticized her for "not taking vacation time like American employees").

### 3.      The August 2007 suspension

Schwarzkopf next argues that Brunswick discriminated against him by "suspending and/or terminating [him] in August 2007," referring to the events of August 17, 2007, when he argued with Hager and was sent home.   (Def. Mem. at 44.)   Yet again, the Court concludes that this suspension did not amount to an adverse employment action.

At the outset, it is clear that Brunswick did not terminate Schwarzkopf's employment on August 17, 2007.   Schwarzkopf testified that Hager told him to go home *for the day*.   Brunswick's records show that the company considered him suspended with pay for the following week, not terminated, and indeed Schwarzkopf's own diary indicates that both Hager and Horner expressly told him so.   And most notably, Schwarzkopf has repeatedly alleged – both in this action and before the EEOC – that he was *constructively discharged*.   (See Mem. in Opp'n at 37 ("The evidence is Schwarzkopf had to leave his employment in order to escape intolerable working conditions."); Gorajski Aff. Ex. B-2, at Ex. 14 (amended EEOC charge: "On August 17, 2007, I was constructively discharged.").) Constructive discharge is necessarily inconsistent with termination, because it requires the employee to *resign* his position.   E.g., Tidwell v. Meyer's Bakeries, Inc., 93 F.3d 490, 494 (8th Cir. 1996).

In light of the foregoing, the only allegedly adverse action Schwarzkopf can point to regarding the events of August 17, 2007, is his suspension the following week.   Yet, there does not appear to be any dispute that Schwarzkopf was paid for that week of work. Hence, for the reasons set forth above with respect to the July 2007 suspension, the August 2007 suspension does not constitute an adverse employment action.

### 4.      Constructive discharge

Finally, Schwarzkopf asserts that Brunswick discriminated by constructively

discharging him.   (Mem. in Opp'n at 44.)   Constructive discharge is an adverse

employment action.   E.g., Tusing v. Des Moines Indep. Cmty. Sch. Dist., 639 F.3d 507,

521 (8th Cir. 2011) (citation omitted).   Nevertheless, the Court concludes that

Schwarzkopf's constructive-discharge claim must fail.

A plaintiff claiming constructive discharge "must show both that he found the

environment to be abusive and that an objective person in his position would have felt that

he had to [resign] because of his discriminatory work conditions."   Id.   Schwarzkopf's

conduct here undermines the conclusion that he found the environment at Brunswick so

hostile and abusive that his only alternative was to quit his job.   Most notably, after Hager

sent him home on August 17, 2007, Schwarzkopf called Mensing on multiple occasions,

telling her that he had not quit and asking how she would remedy the situation.   This

evidence, demonstrating that Schwarzkopf wanted to keep his job even after all of the

harassment he had allegedly suffered at Brunswick, is antithetical to his assertion that he

found the conditions at Brunswick "intolerable."   Tidwell, 93 F.3d at 494; accord Fenney

v. Dakota, Minn. & E. R.R. Co., 327 F.3d 707, 717 (8th Cir. 2003) ("[T]he plaintiff must

subjectively perceive the environment to be abusive.").

Moreover, constructive discharge requires a plaintiff to show that the employer's

conduct was undertaken "deliberately," with the "intention of forcing the employee to

quit."   Tidwell, 93 F.3d at 494.   Because direct evidence of intent is rare, a plaintiff can

show that his employer intended to force him to quit "by showing [his] resignation was a

- 25 -

reasonably foreseeable consequence of [his] employer['s] discriminatory actions."
Hukkanen v. Int'l Union of Operating Eng'rs, Hoisting & Portable Local No. 101, 3 F.3d
281, 285 (8th Cir. 1993). Schwarzkopf makes such an argument here, claiming that
Brunswick's "inaction" to his complaints left him "no basis to believe there was any
chance for fair treatment" and, consequently, led to his resignation. (Def. Mem. at 38.)

But the record belies the assertion that Brunswick took no action in response to
Schwarzkopf's complaints. Indeed, it is undisputed that Mensing repeatedly spoke with
Hager after Schwarzkopf complained of discrimination and harassment. She provided
additional diversity training to Brunswick employees. She looked into his allegations
regarding the e-mailed jokes found in his work area and, in fact, one employee was
disciplined as a result. (Mensing Dep. at 189.) She offered him FMLA leave when he
needed to attend doctors' appointments to treat his mental conditions. And she called him
at least twice after he was suspended on August 17, 2007, in an attempt to discern what had
transpired and what to do about the situation. These facts refute the contention that
Brunswick turned a blind eye to Schwarzkopf's complaints with the intention of forcing
him to quit. See, e.g., Trierweiler v. Wells Fargo Bank, 639 F.3d 456, 460 (8th Cir. 2011)
(evidence showing "an intent to maintain an employment relationship with" the plaintiff
undermines constructive-discharge claim); Devin v. Schwan's Home Serv., Inc., 491 F.3d
778, 790 (8th Cir. 2007) (same).

Moreover, the record reflects that notwithstanding the drop-off in Schwarzkopf's
performance in 2006, Brunswick valued his contributions as an employee and rated his
work satisfactorily. It steadily increased his pay, promoted him, provided him with

positive performance reviews, and gave him at least one discretionary bonus.   These facts, too, undermine the assertion that Brunswick intended to force him to quit.   E.g., Tatom v. Ga.-Pac. Corp., 228 F.3d 926, 932 (8th Cir. 2000).

Viewed in the light most favorable to him, the Court concludes that Schwarzkopf has not satisfied his "substantial burden" of showing that he was constructively discharged. Trierweiler, 639 F.3d at 460.[14]

## C.   Failure to accommodate

Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."   42 U.S.C. § 12112(b)(5)(A).   A plaintiff alleging a failure to accommodate "bears the initial burden of demonstrating that he requested reasonable accommodations." Mershon v. St. Louis Univ., 442 F.3d 1069, 1077 (8th Cir. 2006) (citing U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 401-02 (2002)).   He must also demonstrate that the requested accommodations "would render him otherwise qualified," that is, would enable him to perform the essential functions of his position.   Id.; see 42 U.S.C. § 12111(8).   Here, Schwarzkopf claims that Brunswick failed to accommodate his mental illnesses in three ways, but none of his contentions has merit.

Schwarzkopf argues that he requested a reasonable accommodation by asking that

---

[14]  It is not inconsistent to conclude that Schwarzkopf has made a submissible case on his hostile-work-environment claim while also concluding that he has failed to create a genuine issue on his constructive-discharge claim.   See, e.g., Wilkie, 638 F.3d at 954 ("Hostile work environment and constructive discharge . . . have different elements, and, while a hostile work environment can form the basis for a constructive discharge allegation, hostile work environment discrimination can exist absent a tangible employment action.") (citation omitted).

his supervisors (and others) not yell at him.   (Mem. in Opp'n at 47.)   The Court, however,

concludes that such a request is not reasonable.   Indeed, courts have found that there exists

"no authority for the proposition that cessation of harassment is a required reasonable

accommodation."   Rodriguez v. John Muir Med. Ctr., No. 09-731, 2010 WL 3448567,

at *12 (N.D. Cal. Aug. 31, 2010); accord, e.g., Cox v. Peak, No. 3:08cv422, 2010 WL

3860499, at *10 (S.D. Ohio Apr. 16, 2010) (Report & Recommendation of Ovington, M.J.)

(plaintiff failed to propose reasonable accommodation by asking her "supervisors [to]

leave me alone, you know, and my coworkers [to] stop bothering me and harassing me,

intimidating me, making me feel like I'm this high (indicating)"), adopted, 2010 WL

3769105 (S.D. Ohio Sept. 24, 2010).   As the Eighth Circuit has noted, "[w]e do not

believe . . . that the obligation to make reasonable accommodation extends to providing an

aggravation-free environment."   Cannice v. Norwest Bank Iowa, N.A., 189 F.3d 723, 728

(8th Cir. 1999); accord, e.g., Newby v. Whitman, 340 F. Supp. 2d 637, 657 (M.D.N.C.

2004).

     Schwarzkopf next argues that he requested a reasonable accommodation by asking

to be transferred.   (Mem. in Opp'n at 47.)   But asking for a transfer to avoid certain

co-workers is not a request for a reasonable accommodation.   "[A]n employer is not

required to . . . reassign an employee away from any supervisor or coworker who may

cause stress or conflict."   Newby, 340 F. Supp. 2d at 657; accord, e.g., Gaul v. Lucent

Techs., Inc., 134 F.3d 576, 581 (3rd Cir. 1998) (holding that it is "wholly impractical" to

require an employer to transfer an employee to another department "whenever he becomes

'stressed out' by a coworker or supervisor"); Prichard v. Dominguez, No. 3:05cv40, 2006

WL 1836017, at *13 (N.D. Fla. June 29, 2006) (noting that there is an "overwhelming unanimity of opinion in courts throughout the country" that "employees may not use the [ADA] . . . as the means to obtain a transfer from an undesirable boss").

Finally, Schwarzkopf claims that he requested reasonable accommodation by asking for blueprints for "big jobs." (Mem. in Opp'n at 47-48.) Putting aside the ambiguous nature of this request – what is a "big" job? Is a job "big" to Schwarzkopf also "big" to Hager? – there is no evidence that Schwarzkopf needed written instructions to complete his work. Indeed, his performance reviews indicate that he was satisfactorily performing his job duties. And he has repeatedly asserted that he was capable of performing his job; he testified in his deposition that "[t]o this day, I do not believe my performance was poor." (Schwarzkopf Dep. at 152; see also id. at 172-84.) "[B]ecause [Schwarzkopf] argues that he was capable of performing the essential functions of the [job], he cannot argue that he was entitled to any accommodation." Lowery v. Hazelwood Sch. Dist., 244 F.3d 654, 660 (8th Cir. 2001).[15]

---

[15] Schwarzkopf claims that Brunswick failed to engage in the "interactive process" through which employers and employees attempt to find reasonable accommodations. (Mem. in Opp'n at 49-50.) Yet, "[t]he mere failure of an employer to engage in the interactive process does not give rise to *per se* liability." Ballard v. Rubin, 284 F.3d 957, 960 (8th Cir. 2002). Here, the Court concludes that Brunswick's (alleged) failure to engage in the interactive process is immaterial, because Schwarzkopf has repeatedly asserted he did not require accommodation to perform his job. See Fjellestad v. Pizza Hut of Am., Inc., 188 F.3d 944, 954 (8th Cir. 1999) (notwithstanding that employer is "require[ed] . . . to engage in an interactive process," the employee still must show "that a particular accommodation rejected by the employer *would have made the employee qualified to perform the essential functions of the job*") (emphasis added).

### D.      Retaliation

In his final claim, Schwarzkopf alleges that Brunswick retaliated against him for complaining of discrimination.   To establish a prima facie case of retaliation, he must show that (1) he engaged in protected conduct, (2) he suffered a materially adverse employment action, which is "action that would deter a reasonable employee from making a charge of employment discrimination or harassment," and (3) the materially adverse action was causally linked to the protected conduct.   Fercello v. Cnty. of Ramsey, 612 F.3d 1069, 1077-78 (8th Cir. 2010).[16]

The exact parameters of Schwarzkopf's retaliation claim are unclear; indeed, he seems to label *all* of Brunswick's conduct following his complaints as retaliatory.   The Court concludes, however, that none of the challenged conduct suffices to create a jury question on retaliation.

For instance, Schwarzkopf claims that Mensing conducted a flawed investigation and failed to follow internal procedures when addressing his complaints.   Yet, "shortcomings in an investigation do not by themselves support an inference" of retaliation.   Wierman v. Casey's Gen. Stores, 638 F.3d 984, 997 (8th Cir. 2011) (citation omitted).   This is particularly true where, as here, the investigation was conducted by an

---

[16] Schwarzkopf argues that the MHRA labels a broader range of conduct as retaliatory than does the ADA.   (Mem. in Opp'n at 35-36.)   But the cases are legion holding that such claims "are governed by the same standards."   Fercello, 612 F.3d at 1074 n.2; accord, e.g., Henderson v. Ford Motor Co., 403 F.3d 1026, 1036 (8th Cir. 2005); Tori v. Univ. of Minn., No. A06-205, 2006 WL 3772316, at *9 (Minn. Ct. App. Dec. 26, 2006) (analyzing retaliation claims under ADA and MHRA together); Ross v. City of New Brighton, No. C3-98-1095, 1998 WL 764414, at *2 (Minn. Ct. App. Nov. 3, 1998) (same).   Brunswick argues, in turn, that Schwarzkopf waived the ADA retaliation claim by citing only MHRA cases in his responsive brief.   (See Reply at 9-10.) Because the same standards apply, however, the Court will address each claim on the merits.

individual (Mensing) who is not alleged to have engaged in any of the derogatory or harassing comments.   Id.

Schwarzkopf also alleges that Hager "hounded" him, subjected him to more onerous standards than his co-workers, assigned him menial tasks, and took away certain job duties, like working on the safety committee.   (Mem. in Opp'n at 36, 38-39.)   But these are not "materially adverse actions" sufficient to support a retaliation claim.   See, e.g., Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67-68 (2006) ("normally petty slights, minor annoyances, and simple lack of good manners" insufficient); Clegg v. Ark. Dep't of Corr., 496 F.3d 922, 929 (8th Cir. 2007) (concluding that employer's "failure to provide [plaintiff] training and orientation, denying her access to needed employment tools, failure to reinstate her to her prior position, interfering with her authority, unfairly adding negative reports and reprimands to her personnel file, treating her differently than her coworkers, excluding her from meetings, giving her a negative evaluation, denying her training, and adding days to a training assignment at a different unit" did not suffice to show retaliation).   Simply put, "[m]inor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage do not" suffice.   Higgins, 481 F.3d at 584.

Schwarzkopf also asserts that Brunswick "continued to harass [him] and made him work in a hostile work environment" after he reported the allegedly discriminatory conduct.   (Mem. in Opp'n at 36.)   But the Court fails to see how the continuation of conduct that preceded Schwarzkopf's complaints could somehow be "retaliatory."   Stated differently, it does not appear that the (alleged) harassment occurring after his complaints

is "causally linked" to his reports of harassment – the same conduct was transpiring before

the complaints ever took place.   And there is no assertion that the harassment worsened or

changed in character as a result of Schwarzkopf's complaints to Mensing or Hager.   Cf.

Hervey v. Cnty. of Koochiching, 527 F.3d 711, 723 (8th Cir. 2008) (noting that inference

of retaliation does not arise where employer had been concerned about employee's

performance before she engaged in protected activity).

Schwarzkopf also points to his "constructive discharge" to support his retaliation

claims.   Yet, as discussed above, he has failed to show that Brunswick constructively

discharged him.   This allegation, therefore, does not suffice.

Finally, Schwarzkopf points to his two suspensions as evidence of retaliation.   The

Court concludes, however, that neither can be "causally linked" to "protected conduct."

To show such a link, he argues that the suspensions occurred "immediately" after he

complained of harassment and discrimination (Mem. in Opp'n at 40), but the Eighth

Circuit has repeatedly held that something more than temporal proximity is necessary to

create a jury question on causation.   See, e.g., Hervey, 527 F.3d at 726; Green, 459 F.3d at

916; Smith v. Allen Health Sys., Inc., 302 F.3d 827, 832 (8th Cir. 2002) ("We have

discounted . . . the possibility that mere temporal proximity between protected act and

adverse employment action can establish the necessary causal connection."); Kiel v. Select

Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999) (*en banc*) ("Generally, more than a

temporal connection between the protected conduct and the adverse employment action is

required to present a genuine factual issue on retaliation.").

Regardless, even if temporal proximity sufficed to show causation under certain

circumstances, it cannot carry the day here.   The first suspension occurred in July 2007,

shortly after Schwarzkopf returned from FMLA leave.   Yet, the record is devoid of

evidence that he complained about harassing conduct in the small window between his

return from leave and his suspension – the nearest "protected activity" was his EEOC

charge in May 2007, approximately two months earlier.   This gap is simply too wide.

See, e.g., Lewis v. St. Cloud State Univ., 467 F.3d 1133, 1138 (8th Cir. 2006) ("[A]n

interval as brief as two months d[oes] not show causation for purposes of establishing a

retaliation claim.") (internal citations omitted).   And while Schwarzkopf *was* complaining

in July 2007 about the reassignment of his safety-committee duties, that cannot be

construed as "protected conduct" when just a few months earlier he had told Mensing and

Hager that they "might be better off to replace [him] on the safety committee with someone

else."   (Gorajski Aff. Ex. B-2, at Ex. 34.)

   As for the second suspension in August 2007, there is some evidence in the record

that Schwarzkopf was complaining about Hager's "discriminatory" conduct shortly before

this suspension occurred.   But there is no dispute that Hager and Schwarzkopf got into a

verbal altercation immediately prior to the suspension.   This intervening event "eroded

any causal connection suggested by the temporal proximity of [Schwarzkopf's] protected

conduct and" the suspension.   Cheshewalla v. Rand & Son Constr. Co., 415 F.3d 847, 852

(8th Cir. 2005); accord Wierman, 638 F.3d at 998.[17]

---

[17]  The Court notes that it is not bound by the EEOC's finding of "reasonable cause" that retaliation
occurred.  See, e.g., Kremer v. Chem. Constr. Corp., 456 U.S. 461, 477 (1982) (holding that a
"civil action in federal court following an EEOC decision [is] intended to be a trial de novo");
Minn. Sch. Bd. Ass'n Ins. Trust v. EEOC, 184 F. Supp. 2d 899, 908-09 (D. Minn. 2001) (Kyle, J.).

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Brunswick's Motion for Summary Judgment (Doc. No. 11) is **GRANTED IN PART** and **DENIED IN PART**.   The Motion is **GRANTED** as to all claims in the Complaint except those asserting a hostile-work environment, and as to those claims, the Motion is **DENIED**.[18]

Dated: June 7, 2011                                      s/Richard H. Kyle
                                                         RICHARD H. KYLE
                                                         United States District Judge

---

[18] The Court reminds the parties that this case is on the October 2011 trial calendar.   The parties should be fully prepared to try this matter by October 1, 2011.